**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| SONIA MONTIEL and CAROL NUNES-MCNAMARA, on behalf of themselves and all others similarly situated, | ) | CASE NO.: CA 07 064 ML |
| Plaintiffs, | ) | CLASS ACTION |
| v. | ) | |
| DAVOL INC., and C.R. BARD, INC. | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS UNDER RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM**

Defendants Davol, Inc. ("Davol") and C.R. Bard, Inc. ("Bard") hereby submit their Memorandum of Law in Support of Defendants' Motion to Dismiss under Rule 12(b)(6) for Failure to State a Claim. The plaintiffs allege that their surgeons used Composix® Kugel® Patches to surgically repair their hernias. The Composix® Kugel® Patch is a prescription hernia repair device, regulated under the federal Food, Drug and Cosmetic Act and Medical Device Amendments thereto. Certain versions of the Patch have been recalled by the defendants. Plaintiffs attempt to plead a single cause of action pursuant to the Rhode Island Deceptive Trade Practices Act ("DTPA"), and seek compensation *not* because their medical devices failed and caused them injury, but instead because they allegedly might do so in the future. Plaintiffs seek medical monitoring, a form of relief that has never been recognized under Rhode Island law.

Plaintiffs have not stated any ground for relief under Rhode Island law and thus their claims must be dismissed under Rule 12(b)(6):

First, the DTPA by its terms is inapplicable here. The DTPA explicitly does not apply to any activity regulated by federal or state law. R.I. Gen. Laws § 6-13.1-4. The Composix®

Kugel® Patch is regulated by federal law and monitored by the federal Food and Drug Administration ("FDA"). Under clear Rhode Island Supreme Court precedent, Bard and Davol cannot be liable under the DTPA. *State v. Piedmont Funding Corp.*, 382 A.2d 819, 822 (R.I. 1978) ("[t]he Legislature clearly exempted from the Act all those activities and businesses which are subject to monitoring by state or federal regulatory bodies or officers.").

Second, the DTPA applies only to consumers who have purchased or leased goods or services and who, as a result of an alleged unfair or deceptive practice or act, have suffered an "ascertainable loss of money or property." R.I. Gen. Laws § 6-13.1-5.2. Plaintiffs, who acknowledge that their medical devices have *not* failed or caused them any injury, by definition cannot satisfy this requirement. *Kennedy v. Acura*, No. 01-4063, 2002 WL 31331373 (R.I. Super. Aug. 28, 2002) (granting motion to dismiss claim based on possible future product failure).

Third, plaintiffs have not adequately pleaded the requirements of the DTPA that they are "purchasers" or that the defendants did any particular act that violated any particular provision of the DTPA.

Fourth, the relief at the heart of plaintiffs' complaint, medical monitoring, is not even recognized by Rhode Island law.

## ARGUMENT

### I. Plaintiffs Have No Cause Of Action Under The DTPA.

#### A. The Activities That Are the Subject Of the Lawsuit Are Exempt From Challenge Under the DTPA Because They Are Subject to Federal Regulation

##### 1. The DTPA does not apply to activities that are subject to federal regulation.

Pursuant to R.I. Gen. Laws § 6-13.1-4, the DTPA exempts any claim for unfair or deceptive practices or acts concerning an activity that is subject to regulation or monitoring by a

state or federal regulatory authority.[1] *Lynch v. Conley*, 853 A.2d 1212, 1215 (R.I. 2004) (DTPA exemption applies to alleged failure to disclose lead paint in residential real estate sales because lead exposure "already is comprehensively regulated by the state and federal government"); *Chavers v. Fleet Bank (RI), N.A.*, 844 A.2d 666, 672 (R.I. 2004) (rejecting named plaintiffs' DTPA claim, including putative class action, because credit card solicitations by national banks "are subject to monitoring, supervision and regulation by federal agencies" and fall within the scope of the DTPA exemption); *Kelley v. Cowesett Hills Assocs.*, 768 A.2d 425, 432 (R.I. 2001) (DTPA claims relating to asbestos removal are barred because asbestos removal is regulated by the Rhode Island Asbestos Abatement Act); *Piedmont Funding Corp.*, 382 A.2d at 822 (insurance and mutual fund sales are "permitted only under the authority of the office of the insurance commissioner . . . and only under the rules and regulations of the [SEC]" and thus are within the DTPA exemption); *Roberts v. Fleet Bank (R.I.), N.A.*, 342 F.3d 260, 269 (3d Cir. 2003) (unfair or deceptive acts or practices in credit card solicitations are subject to the Federal Trade Commission Act and federal banking supervisory enforcement and thus fall within the DTPA exemption).

The statutory exemption provides:

> Nothing in this chapter shall apply to actions or transactions permitted under laws administered by the department of business regulation or other regulatory body or officer acting under statutory authority of this state or the United States.

R.I. Gen. Laws § 6-13.1-4.

[1] Bard and Davol need not – and do not – address here the extent to which the substantive law of 50 states and the District of Columbia would have to be applied to any assessment of the certifiability of a class. *See Cruz v. Farquharson*, 252 F.3d 530, 533 (1st Cir. 2001) (until a putative class has been certified, only the claims of the named plaintiffs are at issue). In this motion, defendants address only the *named* plaintiffs' reliance on Rhode Island substantive law as the basis for their claims. *See id.* Plaintiffs have not yet filed a motion to certify their proposed class pursuant to Fed. R. Civ. P. 23. Defendants would oppose any such class certification effort because the Rule 23 requirements cannot be met in this action.

The Rhode Island Supreme Court established its paradigm for interpreting the exemption under the DTPA more than twenty-five years ago. In *Piedmont Funding Corp.*, the Court ruled that alleged deceptive practices in the sale of insurance and mutual funds would not constitute a statutory violation of the DTPA. 382 A.2d at 822. In that case, funds sold by defendants were subject to regulation both by the Rhode Island insurance commissioner and by the Securities Exchange Commission ("SEC"). The plaintiff there specifically argued that the DTPA did not exempt the challenged activity "simply because it is subject to government regulations unless the regulating agency has established that the manner in which the transaction was conducted is a proper way of doing business." *Id.* at 821. The Rhode Island Supreme Court rejected this narrow approach to applying the DTPA exemption, ruling instead that the scope of the exemption under the DTPA is broad:

> Giving the language of § 6-13.1-4 its plain meaning, we conclude that the Legislature clearly exempted from the Act all those activities and businesses which are subject to *monitoring* by state or federal regulatory bodies or officers.

*Id.* at 822 (emphasis added). Once the party claiming exemption "shows that the general activity in question is regulated by a 'regulatory body or officer' within the meaning of § 6-13.1-4," the burden shifts to the other side to show "that the specific acts at issue are *not* covered by the exemption." *Id.* (emphasis added); *see Perron v. Treasurer City of Woonsocket*, 403 A.2d 252, 254 (R.I. 1979) (DTPA exemption applies to exclude all activities and businesses monitored by state or federal regulatory bodies or officers).

The Court applied the same analytical framework in *Chavers*, 844 A.2d at 666. In *Chavers*, the Court concluded that a DTPA claim based on an allegedly deceptive credit card solicitation was barred because the defendant bank was subject to monitoring by a federal

regulator, the Office of the Comptroller of the Currency (OCC).[2] Thus, since the national bank was subject to federal regulatory monitoring, the Court concluded that the burden shifted to the plaintiff to demonstrate that the DTPA exemption did not apply, which the plaintiff in that case failed to do. *Id.* at 670-72.

Even more recently, in the context of a case involving lead paint contamination, the Rhode Island Supreme Court once again confirmed the vitality of the exemption for regulated activity. In *Lynch*, 853 A.2d at 1214-1215, the Court refused to alter its long-standing interpretation of the scope of the DTPA exemption:

> We decline the invitation to overturn *Piedmont Funding* and its progeny. Our holdings on this issue have been uniform for more than twenty-five years, and we discern no reason to rule otherwise. Accordingly, consistent with the doctrine of *stare decisis*, we adhere to the analytical framework developed through our jurisprudence. Any argument in favor of amending the breadth and scope of the DTPA exemption should be made to the General Assembly and not this Court.
>
> We are satisfied that the DTPA's statutory exemption applies in this instance. Lead paint disclosure in the connection with the sale of residential real estate, already is comprehensively regulated by the state and federal government . . . .

*Id.* at 1215.

The Court pointed to the regulation of lead exposure hazards under the Rhode Island Lead Poisoning Prevention Act and the enforcement authority vested in the Department of Health, including the authority to enforce federal regulatory standards concerning lead paint disclosure, as an indication of the regulation and monitoring that placed the activity within the scope of the DTPA exemption. *Id.* at 1216.

In declining to change its view on the scope of the DTPA exemption, the *Lynch* Court also invoked its previous holding in *Kelley*, 768 A.2d at 431-432. In *Kelley*, facing a similar

[2] The OCC has oversight authority for national banks concerning compliance with disclosure requirements for credit card issuers under Federal Reserve Board regulations established pursuant to the federal Truth in Lending Act.

situation regarding an asbestos abatement claim, the Rhode Island Supreme Court declined to recognize any claim under the DTPA arising from asbestos removal. Rather, consistent with its prior holdings, the Court determined that the Rhode Island Asbestos Abatement Act precluded the DTPA asbestos claim. The Court, moreover, explained that "in interpreting § 6-13.1-4, entitled 'Exemptions,' this Court had previously held that the Act expressly sets forth an exemption for activities and businesses that are subject to monitoring by state and federal regulatory bodies or officers." *Id.* at 432 (citing *Doyle v. Chihoski*, 443 A.2d 1243, 1244 (R.I. 1982) (real estate brokers are regulated by the Department of Business Regulation and are within the DTPA exemption)); *Piedmont Funding Corp.*, 382 A.2d at 819; *see Roberts,* 342 F.3d at 269 ("the Rhode Island Supreme Court has instructed, based on the plain meaning of § 6-13.1-4, 'the Legislature clearly exempted from the Act all of those activities and businesses which are subject to monitoring by state or federal regulatory bodies or officers.'") (citations omitted).

Similarly, a Rhode Island trial court has applied the DTPA exemption to exclude an alleged deceptive and unfair practice claim involving an automobile warranty where it was subject to federal regulation. In *Kennedy v. Acura,* C.A. No. 01-4063, 2002 WL 31331373 (R.I. Sup. Ct. Aug. 28, 2002), the court rejected the named plaintiffs' DTPA claim, including a putative class action, because "plaintiffs' claims are exempt from DTPA because they constitute consumer product warranty claims which are governed by the Federal Trade Commission under the Magnuson-Moss Warranty – Federal Trade Commission Improvement Act, 15 U.S.C. § 2301 *et seq.*" *Id.* at *5.

The holdings of the Rhode Island Supreme Court, consistent over a period of more than twenty-five years, have established a simple but powerful precedent under Rhode Island law: there is no consumer claim under the DTPA where the activity that is the subject of the

complaint is monitored or regulated by a state or federal body or officer. The Supreme Court of Rhode Island's rulings have been challenged in a number of different cases involving different federal and state regulatory schemes. In each instance, the Rhode Island Supreme Court has neither wavered nor altered the broad scope of the DTPA exemption for activity regulated by state or federal authorities.

**2. Defendants are regulated by a comprehensive federal regulatory scheme and thus are exempt from the DTPA claims in this lawsuit.**

Not surprisingly given the exemption for regulated activity, there is not a single reported case in Rhode Island in which a DTPA claim appears to have been pressed against a prescription medical device or prescription drug manufacturer. Regardless, plaintiffs' DTPA claim in this particular case must be dismissed because all of the alleged acts at issue are *directly regulated* by the FDA and so fall squarely within the DTPA exemption.

Medical devices such as the Composix® Kugel® Patch are regulated by the FDA pursuant to the Federal Food, Drug, and Cosmetic Act of 1938 ("FDCA"), as amended, 21 U.S.C. §§ 201 *et seq.*, and the Medical Device Amendments of 1976 ("MDA"). The FDCA vests in FDA the plenary authority to monitor and regulate every aspect of medical devices designed, developed, tested, or marketed in the United States, and to provide FDA with statutory enforcement powers to ensure compliance with FDA reporting requirements. Under its statutory authority, FDA regulates all medical device activities. This includes device classifications, investigational device exemptions, premarket notifications and approvals, device notice and application review, good manufacturing practice and design protocols, medical device reports of possible adverse events, postmarketing surveillance for designated devices, device labeling requirements, device advertising and promotion, and postmarketing enforcement regarding product removals, distribution cease-and-desist orders, civil penalties and product recalls. Pursuant to the FDCA

and MDA, FDA has issued comprehensive regulations governing all aspects of medical device safety, efficacy, marketing and promotion.

Plaintiffs claim that the patch was not properly manufactured or designed – actually citing the governing FDA regulations, *see* Compl. ¶ 32(a), (b) ("[defendants] failed to follow … FDA good manufacturing practices"), (c), (g). As the allegations suggest, FDA regulates the design, development, and manufacturing of the patch. Before the Composix® Kugel® Patch even existed, FDA's regulations controlled the protocols for Davol to follow in designing the product. *See* 21 C.F.R. § 820.30. FDA permission was required for the product to be marketed, sold and distributed, and FDA regulations governed the form and content of Davol's application for approval of the patch as safe and effective. *See* 21 C.F.R. §§ 807.81-.100. Once the Patch was approved, Davol's operations were regulated by FDA's Quality System Regulation, which governs, among other things, supply purchasing (21 C.F.R. § 820.50), manufacturing (21 C.F.R. §§ 820.70-.75), product identification and traceability (21 C.F.R. §§ 820.60-.65), handling and storage (21 C.F.R. §§ 820.140-.150), distribution (21 C.F.R. § 820.160), record keeping (21 C.F.R. §§ 820.180-.198), packaging (21 C.F.R. § 820.130) and labeling (21 C.F.R. § 820.120). The Quality System Regulation includes the "Good Manufacturing Practices" mentioned by plaintiffs in their complaint. *See* 21 C.F.R. § 820.1(a) (stating that section sets forth Good Manufacturing Practices regulations).

Plaintiffs further contend that the defendants failed to properly investigate and document reported defects in the patch, failed to monitor such complaints, and failed to report such defects adequately. Compl. ¶ 32 (b), (c), (d), (f). FDA also regulates every one of these areas of conduct. The defendants' maintenance of complaint files is governed by 21 C.F.R. § 820.198, and medical device reporting (the tracking and reporting to FDA of reported medical

complications or product failures) is regulated in detail by 21 C.F.R. §§ 803.1-.22 and 803.50-.58. Under the medical device reporting regulations, manufacturers are directed as to the implementation of a written protocol ensuring the timeliness, effectiveness, and completeness of their device reporting, 21 C.F.R. § 803.17, records they are required to maintain, 21 C.F.R. § 803.18, and the timing and content of the reports that are to be submitted to FDA, 21 C.F.R. §§ 803.50 and .52, among other things.

Finally, plaintiffs contend that they were not adequately warned by the defendants of the risks of the patch, *see* Compl. ¶ 32 (d) & (f), and that defendants' advertising was somehow tortious, *id.* ¶ 32 (c). FDA regulations comprehensively cover these areas of conduct as well. Product labeling is governed by 21 C.F.R. §§ 801.1-.16 and 21 C.F.R. § 801.150, setting forth the form and content of medical device labeling. All labeling, including the warnings that were in effect from the patch's first sale in the United States to the present, were necessarily approved by the FDA, *id.* Advertising and promotion of restricted medical devices, such as those requiring a prescription from a licensed physician or implant by a surgeon, *see* 21 U.S.C. § 360j(e)(1)(A), are governed by Section 502(r) of the FDCA, 21 U.S.C. § 352(r), and are also addressed by the FDA labeling regulations. *See* FDA, *Labeling Regulatory Requirements for Medical Devices*, at 3 ("Most, if not all advertising, is labeling. The term 'labeling' is defined in the FD&C Act as including all printed matter accompanying any article. Congress did not, and we cannot, exclude from the definition printed matter which constitutes advertising.") (citation omitted). The FDCA further prohibits a manufacturer from issuing or using any false or misleading information in advertising a medical device approved by FDA for marketing, 21 U.S.C. § 352(q)(1), and prohibits the marketing of such devices without FDA approval or as otherwise permitted by the FDCA and the Medical Device Amendments ("MDA"). The failure of a manufacturer or its

medical device to comply with all such FDA requirements monitored and enforced by FDA may result in a medical device being deemed "misbranded" and thus subject to enforcement action under the FDCA. 21 U.S.C. § 301-304. Medical devices are also subject to recall authority by FDA pursuant to the FDCA. 21 U.S.C. § 360h(e).

In sum, the Composix® Kugel® Patch is subject to FDA monitoring and regulation under the FDCA and MDA, and FDA regulations, as relates to every aspect of plaintiffs' claims. The extent of this federal monitoring and regulation is at least as comprehensive and pervasive as that of any of the regulatory authorities that the decisions of the Rhode Island Supreme Court have already recognized as exempting regulated activity from claims under DTPA. *E.g., Lynch*, 853 A.2d at 1215 (lead based paint disclosure in residential real estate sales); *Chavers*, 844 A.2d at 670-71 (truth in lending requirements for credit card solicitations); *Kelley*, 768 A.2d at 431-432 (asbestos abatement); *Piedmont Funding Corp.*, 382 A.2d at 822 (insurance and mutual fund sales); *see Doyle*, 443 A.2d at 1244 (DTPA exempts "any transactions or actions that are subject to the supervision of . . . some federal regulatory body.").

Plaintiffs' claims under the DTPA must be dismissed under Rule 12(b)(6). The Composix® Kugel® Patch is monitored and regulated by the FDA under the FDCA and MDA, and thus is exempt under the Rhode Island DTPA.

### B. Plaintiffs' DTPA Claims Must Be Dismissed Because They Have Not Suffered An "Ascertainable Loss Of Money Or Property."

In order to state a cause of action under the DTPA, the plaintiffs must have "suffer[ed an] ascertainable loss of money or property." R.I. Gen. Laws § 6-13.1-5.2. Plaintiffs do not plead or identify any ascertainable loss of money or property, and the nature of their claim is such that there cannot be one; to the contrary, when a plaintiff seeks compensation because an allegedly

defective product *might* break in the future – but has not broken yet – they cannot proceed under the DTPA.

In *Kennedy v. Acura*, a Rhode Island Superior Court was faced with a proposed class action brought under the DTPA on behalf of owners of cars with allegedly defective countershaft snap rings that were prone to break, but had not done so. No. 01-4063, 2002 WL 31331373 (R.I. Super. Aug. 28, 2002). The named plaintiff and the proposed class members were people who "simply possess[ed] a vehicle with a transmission which may [suffer a ring] break at some point in the future." *Id.* at *3. The court noted the requirement of the DTPA that the plaintiff suffer an ascertainable loss of money or property, and held that the plaintiffs' alleged injury – the need for a preemptive repair – "clearly fails to satisfy the statutory requirement." *Id.* at **9-10.

Here, plaintiffs, like those in *Kennedy*, do not seek reimbursement of losses due to deceptive trade practices on the part of a defendant relating to a product that has actually failed. Rather, they ask for prospective relief in the form of future medical monitoring. Compl. ¶ 45. This does not constitute an "ascertainable loss" under Rhode Island law. *Kennedy,* 2002 WL 31331373 at **9-10; *see also Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 318, 320 (on interlocutory appeal, reversing trial court's certification of a Texas DTPA class and dismissing the case; plaintiffs claimed no actual injury, and thus have no standing under Texas law and cannot present a justiciable case or controversy).

To the extent that plaintiffs seek *reimbursement* compensation for the price of the patches that were implanted into them and the surgery by which they were implanted,[3] these are not "ascertainable losses" that relate to the alleged defect. Indeed, plaintiffs expressly disclaim damages from the defect itself. *See* Compl. ¶ 29 (plaintiffs are those who have *not* "developed a

[3] *See* Compl. ¶ 43 (seeking reimbursement for cost of Composix Kugel patch); ¶ 45 (medical costs associated with implantation of Composix Kugel patch).

manifest and diagnosed injury as a result of the product"). Therefore, for purposes of the DTPA, plaintiffs simply received the benefit of their bargain – a hernia repair – and no claim for damages exists. *See, e.g., Kennedy*, 2002 WL 31331373, at **9-10 (refusing to find an ascertainable loss where plaintiffs automobile functioned normally and there was no evidence of a transmission ring break); *see also Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 176-77 (D.D.C. 2003) (in dismissing a claim under DC's consumer protection statute the court held "[w]ithout alleging that a product failed to perform as advertised, a plaintiff has received the benefit of his bargain and has no basis to recover purchase costs."); *Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 320 (5th Cir. 2002) (dismissing claim under Texas DTPA because plaintiff did not allege prescription medication was ineffective for its advertised purposes thus failing to establish an injury-in-fact); *cf. Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 697 (2d Cir. 1994) (precluding liability under New York consumer protection law where plaintiff failed to demonstrate any injury as a result of allegedly misleading advertisements).

## II. Plaintiffs Have Failed To Plead The Statutory Requirements Of A Cause Of Action Under The DTPA.

The DTPA permits a purchaser of goods or services to bring an action for an ascertainable loss resulting from an unfair or deceptive trade practice or act. R.I. Gen. Laws § 6-13.1-5.2. Plaintiffs have neither alleged nor shown that they are "purchasers" under the statute. Instead, they claim to have received the patch as part of a hernia surgery, and they make no allegation that the patch was in any way sold *to them* by Bard, Davol, or anyone else.

This pleading defect independently warrants dismissal under Fed. R. Civ. P. 12(b)(6), but even if they had *pleaded* that they were purchasers under the act, they are not "purchasers" within the meaning of the DTPA. Although Rhode Island's DTPA has not been interpreted in the light of medical device or pharmaceutical claims – probably because of the obvious bar of the

exemption for regulated activities – it has been interpreted in other contexts to bar claims that fall outside of a traditional consumer/vendor relationship. For example, in *Kelley*, the Rhode Island Supreme Court held that a lessor could not sue under the DTPA for alleged deceptive trade practices involving floor tiles in her apartment, because "[t]he role of the respective parties in this case cannot reasonably be construed to establish a consumer/vendor relationship necessary to invoke the Act." 768 A.2d at 431. Under some analogous consumer protection regimes in which claims concerning regulated activities are cognizable, claims brought by recipients of implanted medical devices are *not*. *See Kemp v. Pfizer*, 835 F. Supp. 1015, 1024-25 (E.D. Mich. 1993) (implantation of heart valve is not a sale of a consumer product under the Magnuson-Moss Warranty Act, and noting that "[g]oods that are not customarily available to the ordinary person are not consumer products"); *Goldsmith v. Mentor Corp.*, 913 F. Supp. 56, 63 (D.N.H. 1995) (implanted medical device not a consumer product under Magnuson-Moss Act); *In re Minn. Breast Implant Litig.*, 36 F. Supp. 2d 863, 876 (D. Minn. 1998) (same).

In addition to their failure to plead that they are "purchasers" under the DTPA, plaintiffs have not pleaded facts constituting any alleged unfair trade practice or act within the meaning of the DTPA. Plaintiffs' identification of the alleged violations of the DTPA neither cites any of the twenty subsections of the DTPA that state with particularity the specific practices or acts that are considered unfair or deceptive under the statute, nor states what acts the defendants allegedly did that might subject them to liability under one of those subsections. This defect is fatal to their complaint under the DTPA. Plaintiffs' claim is simply that "Defendants' representations and material omissions to patients, physicians and consumers, including Plaintiffs and Class members, constituted unfair and deceptive acts or practices in violation of R.I. Gen. Laws § 6-13.1-1, et seq." Compl. ¶ 42. That conclusory allegation says nothing at all about what

defendants are supposed to have done, and to whom. The Federal Rules "are not so liberal as to allow purely conclusory statements to suffice to state a claim that can survive a motion to dismiss under Rule 12(b)(6)." *Miller v. Cont'l Airlines, Inc.*, 260 F. Supp. 2d 931, 935 (N.D. Cal. 2003).[4] The DTPA claim must be dismissed because plaintiffs fail to adequately plead any unfair or deceptive conduct under the DTPA.

**III. Plaintiffs' Claims Must Be Dismissed Because Rhode Island Does Not Recognize Medical Monitoring.**

Plaintiffs' DTPA claim must be dismissed for the independent reason that the remedy that lies at the heart of it, medical monitoring, does not exist under Rhode Island law. Plaintiffs take pain not to state a formal *cause of action* for medical monitoring, but a cause of action without a remedy is a nullity, and such is the fate of plaintiffs' claim. Medical monitoring is the primary remedy that the plaintiffs seek. *See* Compl., Prayer for Relief ¶ 2 (seeking an order establishing a medical monitoring program). Moreover, it is the *only* financial or other loss that the plaintiffs can identify explicitly. *See* Compl. ¶ 27 (Montiel has sustained damages "including, but not limited to, medical monitoring by means of a CT scan every 3 months"); ¶ 28 (Nunes-McNamara has sustained damages "including, but not limited to, medical monitoring"); ¶ 45 ("Plaintiffs and the Class have incurred and will likely continue to incur medical costs . . . including medical monitoring").

In evaluating whether plaintiffs may go forward with this lawsuit in the light of the legal theories they have invoked, the Court must "apply the law of the forum *as we infer it presently to be*, not as it might come to be," *Dayton v. Peck, Stow & Wilcox Co.*, 739 F.2d 690, 694 (1st Cir.

[4] Moreover, to the extent plaintiffs are alleging fraud or mistake, their claims are not stated with adequate particularity as required by federal pleading standards. *See* Fed. R. Civ. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999) ("This circuit has interpreted Rule 9(b)

1984) (declining to apply theory of recovery not adopted by state law) (emphasis added). The First Circuit Court of Appeals has directed that, "[a]bsent some authoritative signal from the legislature or the courts" of the state, a federal court should not "even consider[] the pros and cons of innovative theories." *Id.* And "[a]bsent a clear signal from the [state] courts," this Court must "decline to broaden the scope" of state tort law. *Dryden Oil Co. of New England, Inc. v. Travelers Indem. Co.*, 91 F.3d 278 (1st Cir. 1996) (declining to apply tort of wrongful entry beyond its scope under state case law); *see also City of Philadelphia v. Lead Indus. Assoc., Inc.*, 994 F.2d 112, 113 (3d Cir. 1993) (affirming dismissal of tort claims based on unaccepted theories of collective liability because "our role is to apply the current law of the appropriate jurisdiction, and leave it undisturbed"); *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 314 (5th Cir. 1998) (refusing to recognize market share liability because "[w]e apply Texas law as it currently exists").

Plaintiffs' claims must therefore be dismissed because neither the Rhode Island Supreme Court nor the Rhode Island Legislature has recognized medical monitoring. There is, in fact, *no* Rhode Island case known to Bard or Davol in which medical monitoring is even addressed as a claim or remedy. In other cases in which plaintiffs sought medical monitoring in the absence of state-court acceptance of the remedy, federal courts have dismissed the claims. *See Norwood v. Raytheon Co.*, 414 F. Supp. 2d 659, 664 (W.D. Tex. 2006) (dismissing medical monitoring claim where Texas had not adopted medical monitoring, and thus "doing so would constitute an improper 'substantive innovation' of state law"); *Trimble v. Asarco, Inc.*, 232 F.3d 946, 963 (8th Cir. 2000) (not allowing medical monitoring claim because of no evidence that such claims are recognized by Nebraska law); *Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 552 (D. Minn.

---

to require specification of the time, place, and content of an alleged false representation") (internal quotation omitted).

1999) (holding that "[g]iven the novelty of the tort of medical monitoring and that the Minnesota Supreme Court has yet to recognize it as an independent theory of recovery, this Court is not inclined at this time to find that such a tort exists under Minnesota law").

Since this Court is bound to "apply the law of the forum as we infer it presently to be, not as it might come to be," *Dayton*, 739 F.2d at 694, it need not guess whether the Rhode Island Supreme Court would create a new cause of action or remedy for medical monitoring.[5] If it were to engage in such guessing, the Court would have to speculate not only whether the Rhode Island Supreme Court would recognize medical monitoring in general, but also whether it would recognize the most extreme form of medical monitoring – medical monitoring in the absence of a physical injury. That is so because the plaintiffs claim not to have suffered any physical injury. As *Dayton* and *Dryden Oil* hold, the Court is not to engage in speculation in the first place about a remedy that Rhode Island has never even contemplated, much less adopted. But were it to do so even in the absence of any state-law decision on the subject, it must conclude based on Rhode Island's handling of similar tort law principles, that Rhode Island would *not* recognize medical monitoring claims by asymptomatic plaintiffs. Rhode Island law does not recognize tort liability for speculative injury, as the Rhode Island Supreme Court recently explained in *Perotti v. Gonicberg*, 877 A.2d 631, 637 (R.I. 2005). In that case, a pregnant woman who was in an automobile accident but was not injured sued based on her fear that she and her unborn fetus

---

[5] Whether to expand Rhode Island tort law to permit claims for medical monitoring and, if so, under what circumstances and subject to what conditions, is the kind of determination that involves complex policy considerations that are best left to the legislature. *See, e.g., Badillo v. American Brands, Inc.*, 16 P.3d 435, 440 (Nev. 2001) (refusing to recognize a medical monitoring cause of action and noting that "[a]ltering common law rights, creating new causes of action, and providing new remedies for wrongs is generally a legislative, not a judicial, function"); *Duncan v. Northwest Airlines, Inc.*, 203 F.R.D. 601, 605-06 (W.D. Wash. 2001) (refusing to recognize a medical monitoring cause of action after noting that "[t]he Washington Supreme Court has traditionally deferred to the state legislature for the creation of new causes of action").

might experience future health problems due to the accident. The Court held that "the mere possibility of some future harm occurring as the result of defendant's negligence is not enough by itself to support a negligence claim." *Id.*; *see also Reilly v. United States*, 547 A.2d 894, 896 (R.I. 1988) (emotional distress claim must be accompanied by physical symptoms to be cognizable under Rhode Island law).

The Rhode Island Supreme Court similarly rejected a plaintiffs' attempt to expand Rhode Island tort law to impose liability for possible future injuries in *Kelley v. Cowesett Hills Assocs.*, 768 A.2d 425, 430 (R.I. 2001). There, the Rhode Island Supreme Court rejected a fear of cancer cause of action, reasoning by analogy from collected cases applying the same rule in infliction of emotional distress context. The Court's decision was based in part on the concern that "[i]f mere exposure to a potential carcinogen was actionable, the courts would be inundated with actions arising merely from an individual's daily activities such as consuming a soft drink." *Id.*

The same policy concerns advanced in *Kelley* apply equally to claims for medical monitoring by plaintiffs who allege no present injury from their use of an allegedly defective product that has caused them no harm. For similar reasons, the United States Supreme Court in *Metro-North Commuter Railroad Co. v. Buckley*, 521 U.S. 424 (1997), refused to recognize claims for emotional distress and lump-sum medical monitoring damages by plaintiffs who allege toxic exposure, but who have no present physical injury or symptoms. In reaching its holding, which involved claims under the Federal Employers' Liability Act, the Court emphasized the following public policy considerations:

> [A]n exposed plaintiff can recover related reasonable medical monitoring costs if and when he develops symptoms. *Id.* at 438.
>
> Because "tens of millions of individuals may have suffered exposure to substances that might justify some form of substance-exposure-related medical monitoring," recognition of medical monitoring claims could threaten "a flood of less important cases"

> that would "absorb[] resources better left available to those more seriously harmed." *Id.* at 442.
>
> For the same reason, recognition of medical monitoring claims could result in "the systemic harms that can accompany unlimited and unpredictable liability." *Id.*
>
> Medical monitoring claims "would ignore the presence of existing alternative sources of payment, thereby leaving a court uncertain about how much of the potentially large recoveries would pay for otherwise unavailable medical testing and how much would accrue to plaintiffs for whom employers or other sources (say, insurance now or in the future) might provide monitoring in any event." *Id.* at 442-43.

Given the Rhode Island Supreme Court's rejection of tort liability based on the possibility of future injury in the absence of current injury in *Kelley*, and the fact that medical monitoring without injury would subject Rhode Island courts to a dramatic increase in the volume of cases that could be brought there, the most reasonable conclusion is that, it too, would likely decline to recognize a medical monitoring cause of action or remedy by plaintiffs who, like plaintiffs here, have no physical injury or symptoms of disease. This holding would be consistent with traditional tort law principles. As one commentator recently summarized, "[f]or over two hundred years, one of the fundamental principles of tort law has been that a plaintiff cannot recover without proof of physical injury." Victor E. Schwartz, *Medical Monitoring -- Should Tort Law Say Yes?*, 34 Wake Forest L. Rev. 1057, 1059 (1999).[6] The case law powerfully suggests that Rhode Island would *not* alter its general rule that tort liability claims in

---

[6] "Medical monitoring remains a novel, nontraditional tort and remedy." *Duncan*, 203 F.R.D. at 607. In *Wood*, the Supreme Court of Kentucky reasoned:

> Thus, having weighed the few potential benefits against the many almost-certain problems of medical monitoring, we are convinced that this Court has little reason to allow such a remedy without a showing of present physical injury. Traditional tort law militates against recognition of such claims, and we are not prepared to step into the legislative role and mutate otherwise sound legal principles.

*Wood v. Wyeth-Ayerst Labs., Div. Of Am. Home Prods.*, 82 S.W.3d 849, 859 (Ky. 2002).

Rhode Island require a physical injury. *See Selwyn v. Ward*, 879 A.2d 882, 886 (R.I. 2005) (elements of negligence include "actual loss or damage"); *Mills v. State Sales, Inc.*, 824 A.2d 461, 467 (R.I. 2003) (same).

The rejection of plaintiffs' medical monitoring claims would also be consistent with the recent trend in tort law. The last five state high courts to consider the issue have decided against medical monitoring. *See Paz v. Bruch Engineered Materials, Inc.*, 2007 WL 14891 (Miss. Jan. 4, 2007) (rejecting proposed medical monitoring class action suit absent physical injury); *Hinton v. Monsanto Co.*, 813 So. 2d 827 (Ala. 2001) (declining to allow medical monitoring claim); *Badillo v. Am. Brands, Inc.*, 16 P.3d 435 (Nev. 2001) (same); *Wood v. Wyeth-Ayers Labs*, 82 S.W.3d 849 (Ky. 2002); *Henry v. Dow Chem. Co.*, 701 N.W.2d 684 (Mich. 2005) (same); *see also Metro-North Commuter R.R.*, 521 U.S. at 424 (1997) (rejecting medical monitoring as a cause of action under FELA).[7]

---

[7] In addition, Delaware, Indiana, Kansas, Michigan, Minnesota, Missouri, North and South Carolina, Virginia, Washington, and the Virgin Islands have rejected medical monitoring for patients who do not have actual physical injuries. *See Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647 (Del. 1984) (claim for medical surveillance not recognized absent present physical injury); *Johnson v. Abbott Labs.*, No. 06C01-0203-PL-89, 06C01-0206-CT-243, 2004 WL 3245947, at *6 (Ind. Cir. Dec. 31, 2004) ("Indiana does not recognize medical monitoring as a cause of action") (citation omitted); *Burton v. R.J. Reynolds Tobacco Co.*, 884 F. Supp. 1515, 1522-23 (D. Kan. 1995) (dismissing separate medical monitoring count for failure to state a claim under Kansas law but allowing plaintiff to pursue medical monitoring relief for his other claims, which alleged existing physical injuries); *Henry v. Dow Chem. Co.*, 701 N.W.2d 684, 686 (Mich. 2005) (reversing circuit court order and remanding for entry of summary disposition for defendant; plaintiffs' medical monitoring claim was not premised on present injury and thus was not a viable negligence claim under Michigan law); *In re St. Jude Med., Inc. Silzone Heart Valves Prods. Liab. Litig.*, No. MDL 01-1396 JRTFLN, 2004 WL 45504, at *8 (D. Minn. Jan. 5, 2004) (stating that Minnesota "recognize[s] a claim for medical monitoring, but impose[s] an 'injury' requirement"), *rev'd and remanded on other grounds*, 425 F.3d 116 (8th Cir. 2005); *Thomas v. FAG Bearings Corp.*, 846 F. Supp. 1400, 1410 (W.D. Mo. 1994) ("Entitlement to the costs of future medical monitoring requires plaintiff to prove an actual present injury and an increased risk of future harm.") (citation omitted); *Trimble v. Asarco, Inc.*, 232 F.3d 946, 963 (8th Cir. 2000) (holding that plaintiffs, who sought medical monitoring relief without asserting any present physical injury, "have not asserted a cognizable medical monitoring claim under Nebraska law"); *Carroll v. Litton Sys., Inc.*, No. B-C-88-253, 1990 WL 312969, at **51-52 (W.D.N.C. Oct. 29, 1990) (predicting North Carolina law and holding that medical monitoring claims are not cognizable under North Carolina law absent present physical injuries);

## CONCLUSION

Plaintiffs' sole claim, invoking the Rhode Island DTPA, must be dismissed. The actions plaintiffs challenge are squarely subject to a statutory exemption for regulated activities, plaintiffs have failed to plead what they must to qualify to invoke the DTPA – that they are "purchasers" who suffered an "ascertainable loss" – and plaintiffs' remedy, medical monitoring, is not even recognized by Rhode Island law. Thus, this lawsuit must be dismissed in its entirety.

---

*Rosmer v. Pfizer, Inc.*, No. 9:99-2280-18RB, 2001 WL 34010613, at *5 (D.S.C. Mar. 30, 2001) ("South Carolina has not recognized a cause of action for medical monitoring"); *Ball v. Joy Techs., Inc.*, 958 F.2d 36, 39 (4th Cir. 1991) (predicting Virginia law and holding that "claim for medical surveillance costs is simply a claim for future damages," which is available only if plaintiff has sustained a present, physical injury that was proximately caused by defendant), *cert. denied*, 502 U.S. 1033 (1992); *Purjet v. Hess Oil V.I. Corp.*, No. 1985/284, 1986 WL 1200, at *4 (D.V.I. Jan. 8, 1986) (refusing to recognize medical monitoring claim under Restatement (Second) and law of Virgin Islands in absence of demonstrable, physical injury); *Duncan v. N.W. Airlines, Inc.*, 203 F.R.D. 601, 609 (W.D. Wash. 2001) (predicting Washington law and holding that flight attendant had no independent cause of action for medical monitoring due to exposure to second-hand smoke, but permitting her to seek medical monitoring as remedy for negligence claim, which alleged existing physical injury); *see also In re Berg Litig.*, 293 F.3d 1127, 1133 (9th Cir. 2002) ("a cause of action for medical monitoring because of a future risk of disease, and absent a present physical injury, ... fails to meet the jurisdictional requirements of the Price Anderson Act").

Date: March 6, 2007

Respectfully submitted,

/s/ Mark T. Nugent
Mark T. Nugent
RI Bar No. 2637
MORRISON MAHONEY LLP
121 South Main Street, Suite 600
Providence, RI 02903-7141
(401) 331-4660
(401) 351-4420 (fax)
mnugent@morrisonmahoney.com

Joe G. Hollingsworth, *pro hac vice* pending
D.C. Bar No. 203273
Kirby T. Griffis, *pro hac vice* pending
VA Bar No. 39342
William J. Cople, III, *pro hac vice* pending
D.C. Bar No. 384984
SPRIGGS & HOLLINGSWORTH
1350 I Street N.W.
Washington, DC 20005
(202) 898-5800
(202) 682-1639 (fax)
jhollingsworth@spriggs.com
kgriffis@sprigg.com
wcople@spriggs.com

Attorneys for Defendants
C.R. BARD, INC. and DAVOL INC.